IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| PATRICIA K. HARLOW, | ) | 8:05CV486 |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## I.  INTRODUCTION

In this social security appeal, the claimant, Patricia K. Harlow, contends that a decision of the Commissioner of the Social Security Administration to deny her disability insurance benefits is contrary to law and not supported by the evidence. After having carefully reviewed the record, I find that the Commissioner's decision must be reversed and the cause remanded for further administrative proceedings.

### A.  Procedural Background

Harlow applied for Title II benefits on August 23, 2002, claiming a disability onset date of January 1, 1999.  Her application was denied initially on February 21, 2003, and on reconsideration on June 10, 2003.  A hearing before an administrative law judge (ALJ) was held on June 22, 2004.  Harlow and a vocational expert (VE) testified at the hearing, and medical records were received in evidence.  Following the hearing, the ALJ received additional medical records, including treatment notes from the Medical Pain Relief Clinic in Omaha, Nebraska (Ex. 16F), and also a psychiatric review technique form (PRTF) that was completed on July 5, 2004, by a counselor at the Medical Pain Relief Clinic (Ex. 17F).

In a decision issued on November 22, 2004 (Tr. 17-26), the ALJ ruled that Harlow is not disabled and, among other things, found that:

1. Harlow has not engaged in substantial gainful activity since the alleged onset of disability.
2. Harlow has severe impairments[1] of cervical dystonia, right trapezius myofasciitis, right shoulder bursitis, and anxiety disorder, not otherwise specified (NOS).
3. These impairments do not meet or equal those listed in 20 C.F.R., Part 404, Subpart P, Appendix 1 (the "listings").
4. Harlow has the residual functional capacity (RFC) to perform sedentary work with "moderate" limitation in overhead and side reaching with the right dominant upper extremity (less than 3 hours in an 8-hour shift) and "slight" limitations in attention/concentration and understanding/memory.
5. Harlow is unable to perform any of her past relevant work as a certified nurse assistant (heavy, semi-skilled), teacher's aide (sedentary or light, semi-skilled), and activities coordinator (medium, unskilled).
6. Harlow is a younger individual with a high school education but no transferable skills from any past relevant work.
7. Harlow has the RFC to perform a significant range of sedentary work, and there are a significant number of jobs in the national economy that she could perform, including work as an office clerk and record clerk.

Harlow's request for a review of the ALJ's unfavorable decision was denied by the Appeals Council on August 20, 2005. Her complaint was timely filed in this court on October 21, 2005. The matter is now fully briefed and ripe for decision.

---

[1] A medically determinable impairment is "severe" if it significantly limits an individual's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521.

2

### B. Issues on Appeal

Harlow argues that the ALJ's decision should be reversed because:

1. The ALJ erred by rejecting the PRTF completed by Harlow's counselor (Ex 17F) and by failing to find that she meets Listing 12.04 (affective disorders).

2. The ALJ's hypothetical questions to the VE failed to include all of Harlow's physical limitations and ignored her mental impairments.

3. The ALJ failed to properly evaluate Harlow's subjective complaints of pain under Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).

### II. DISCUSSION

Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II, which in this case is the ALJ's decision. A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole. Hogan v. Apfel, 239 F.3d 958, 960 (8th Cir. 2001). "Substantial evidence" is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. Id., at 960-61; Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome. See Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).

This court must also review the decision of the Commissioner to decide whether the proper legal standard was applied in reaching the result. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992). Issues of law are reviewed de novo. Olson v. Apfel, 170 F.3d 820, 822 (8th Cir. 1999); Boock v. Shalala, 48 F.3d 348, 351 n.2 (8th Cir. 1995); Smith, 982 F.2d at 311.

## A. Psychiatric Review Technique Form

The special procedures for mental impairment claims require either the ALJ or a psychiatrist or psychologist to complete a PRTF. See Pickney v. Chater, 96 F.3d 294, 296 n. 2 (8th Cir. 1996). The PRTF is a standardized document that mirrors the listings for mental impairments set forth in the social security regulations. See Mapes v. Chater, 82 F.3d 259, 262 n. 8 (8th Cir. 1996).

In this case, in conjunction with the reconsideration of Harlow's claim, an examination was conducted on April 17, 2003, by a consulting psychologist, Jane Warren, Ph.D., who concluded that Harlow "does not appear to qualify for any type of psychiatric diagnosis." (Tr. 215.) Based on that examination, another consulting psychologist, Linda Schmechel, Ph.D., completed a PRTF simply by checking a box to indicate that Harlow had "no medically determinable impairment." (Tr. 218.)

The findings made by these consulting psychologists are inconsistent with the ALJ's determination that Harlow has an anxiety disorder. The ALJ's determination appears to have been based upon his review of the Medical Pain Relief Clinic records, particularly the treatment notes kept by LeRoy N. Edwards, M.S., L.M.H.P. (licensed mental health practitioner), C.P.C. (certified professional counselor). Mr. Edwards began seeing Harlow on December 17, 2002,[2] at which time he made a diagnosis of "adjustment disorder with mixed anxiety and depressed mood." (Tr. 185.) This diagnosis was not based on any mental status examination or psychological testing.

On July 5, 2004, Mr. Edwards completed a PRTF in which he diagnosed Harlow as suffering from affective and anxiety-related disorders. (Tr. 380.) In this regard, he indicated that Harlow has depression characterized by sleep disturbance, decreased energy, feeling of guilt or worthlessness, and difficulty concentrating or

---

[2] Harlow started going to the Medical Pain Relief Clinic on May 28, 2002, and was seen regularly by Jeffrey L. Edwards, M.D., for physical exams.

4

thinking (Tr. 383), and generalized persistent anxiety accompanied by motor tension and apprehensive expectation (Tr. 385). The "A criteria" findings related to anxiety do not meet the minimum requirements for Listing 12.06.[3] For the "B criteria" of the listings, Mr. Edwards found in relation to both mental disorders that Harlow has "marked" restrictions in activities of daily living, "marked" difficulties in maintaining social functioning, and "moderate" difficulties in maintaining concentration, persistence, or pace. (Tr. 390.) Mr. Edwards also made a "C criteria" finding [4] that

---

[3] Generalized persistent anxiety must be accompanied by three out of four listed signs or symptoms. See 20 C.F.R. Pt 404, Subpt. P, App. 1, § 12.06. In Exhibit 17F, Mr. Edwards noted only two signs or symptoms of anxiety.

[4] The required level of severity for affective disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied. See 20 C.F.R. Pt 404, Subpt. P, App. 1, § 12.04.

To meet the "B criteria," a depressive syndrome must result in at least two of the following:
    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration.

For the "C criteria" to be satisfied, there must be:
    A medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
        1. Repeated episodes of decompensation, each of extended duration; or
        2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

Harlow has a "[m]edically documented history of . . . affective (12.04) disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and . . . [a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." (Tr. 391.)

The ALJ refused to give any weight to Mr. Edwards' PRTF, calling it an "extreme assessment." (Tr. 22.) The ALJ explained:

> Exhibit 17F . . . is grossly inconsistent with [Mr. Edwards'] treatment notes showing longitudinal improvement with treatment, no panic attacks and only occasional nightmares. Mr. Edwards's progress notes indicate that the claimant has anxiety only when she has to write checks and pay bills. Mr. Edwards repeatedly reports significant improvement in the claimant's mental health. It is reasonable to assume that if Mr. Edwards believed the claimant is as limited as he assessed in Exhibit 17F, he would have reported findings consistent with level of impairment in his progress notes. In addition, Mr. Edwards' assessment is not supported by any mental status examination or psychological testing. In fact, the claimant does not use any psychiatric medications (Exhibit 7E/3)[5] and she has not sought work-up and treatment by a psychologist or psychiatrist.

> I find that Mr. Edwards' treatment notes, the claimant's failure to use psychiatric medications and the claimant's lack of work-up or treatment by a psychologist or psychiatrist support a finding that she has slight limitations in attention/concentration and understanding/memory. This

---

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

[5] Exhibit 7E/3 is a listing by Harlow of her then-current medications. These included Zonegran, Trileptal, Bextra, Oxycodone, and Kadian. All were prescribed by Dr. Jeffrey Edwards (not to be confused with LeRoy Edwards).

6

assessment is not inconsistent with the assessment from the consultative psychological examiner [Dr. Warren] at Exhibit 6F.

Accordingly, I conclude that the Psychiatric Review Technique Form findings are: a mild restriction of activities of daily living; no difficulty with social functioning; and mild difficulties maintaining concentration, persistence, or pace. There are no episodes of decompensation.

(Tr. 22-23.)

Harlow does not claim that the ALJ was required to accept Mr. Edwards' assessment at face value.[6] Instead, she argues that some of Mr. Edwards' notes were

---

[6] "[A]s a licensed therapist Mr. [Edwards] is not an 'acceptable medical source[ ],' see 20 C.F.R. § 416.913(a) (listing acceptable medical sources); § 416.913(d) (including therapists in the list of "other sources") . . .. Tindell v. Barnhart 444 F.3d 1002, 1004 (8th Cir. 2006).

Medical opinions are but one type of medical evidence used to evaluate a disability claim. The social security regulations provide a detailed explanation of how the Commissioner will evaluate opinion evidence. If a treating source's medical opinion about the nature and severity of the claimant's impairments is well-supported by medical evidence and is not inconsistent with other substantial evidence in the case, the treating source opinion is entitled to controlling weight. § 416.927(d)(2). The regulations define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairments." § 416.927(a)(2). "Treating source" is defined as the claimant's "own physician, psychologist, or other acceptable medical source" who provides the claimant with medical treatment or evaluation on an ongoing basis. § 416.902. By definition then, the controlling weight afforded to a "treating source" "medical opinion" is reserved for the medical opinions of the claimant's own physician, psychologist, and other acceptable medical source. . . . Thus, in considering the evidence, including opinion evidence, from Mr. [Edwards] as an "other source," the ALJ was not bound by the treating

7

taken "out of context" because other entries that support her claim of mental impairment were not discussed in the ALJ's decision. I conclude that any such omissions are not reversible error.

Although the ALJ's one-paragraph summary[7] of Mr. Edwards' notes is not

---

source regulations but had "more discretion" and was "permitted to consider any inconsistencies found within the record." Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005) (evaluating therapist's assessment as "other medical evidence" rather than as a treating source opinion).

Id. at 1004-5.

[7] The ALJ summarized Mr. Edwards' treatment notes as follows:

Exhibit 16F, submitted post-hearing, contains additional records from LeRoy Edwards covering the period from December 31, 2002, to July 2004. The claimant's treatment continued to consist of therapy sessions and keeping a journal. There is no evidence she was prescribed psychiatric medications. Mr. Edwards stated on January 28, 2003 that journaling is working out for the claimant beyond his expectations, and she has made "amazing progress." (Exhibit 16F/59). The claimant reported on February 22, 2003 that she has very limited anxiety, only around check signing time. Mr. Edwards noted that her sense of humor is still good (Id. at 58). Mr. Edwards stated on March 11, 2003 that keeping a daily journal is having a "wonderful positive effect" and is a significant source of releasing anger (Id. at 57). Mr. Edwards stated on April 1, 2003 that the claimant continues to do much better and journaling has been very, very helpful (Id. at 55). Mr. Edwards noted on May 27, 2003 that the claimant's anger level has been significantly reduced and she is no longer journaling (Id. at 51). The claimant stated on July 15, 2003 that she is doing well with her daughter's new baby and will probably begin journaling again (Id. at 46). The claimant told Mr. Edwards on August 5, 2003 that she has been busy with her new granddaughter. The claimant stated she still has some anxiety at the end of the month when she pays her bills; however, she is able to get through

8

all-encompassing, it appears to be accurate.[8] In fact, Harlow's only challenge to the accuracy (as opposed to the completeness[9]) of the ALJ's summary is a statement

> it. Mr. Edwards remarked that she is making good progress (Id. at 44). Mr. Edwards reported on August 19, 2003 that the claimant's anxiety level seems to be well within normal limits except perhaps at check writing time (Id. at 42). Mr. Edwards stated on September 2, 2003 that he continues to see significant improvement in the claimant's mental health (Id. at 40). Mr. Edwards commented on September 30, 2003 that the sessions are "exceptionally satisfying," the claimant is very positive and upbeat and she has made significant improvement. Mr. Edwards was very pleased with her progress and remarked that her current overall mental health appears to be nearly normal (Id. at 36). Mr. Edwards reported on December 8, 2003 that the claimant has not had a nightmare for quite some time and her anxiety only occurs at check writing time (Id. at 26). The claimant reported on January 19, 2004 that she is sleeping well and is not having any nightmares (Id. at 22). Mr. Edwards noted on February 2, 2004 that he is seeing significant improvement in the claimant's mental health (Id. at 20). The claimant told Mr. Edwards on April 12, 2004 that her prescription seems to be working in that she is sleeping rather well and is not having panic attacks (Id. at 10). Mr. Edwards reported on July 20, 2004 that the claimant has not had any nightmares and no panic attacks even though she is moving, which would be stressful (Id. at 4).

[8] In the copy of the administrative record that is on file in this case, many of the notes are illegible.

[9] Specifically, Harlow complains about the following omissions:

> The ALJ forgot to mention that [in the entry of January 28, 2003, Mr. Edwards also remarked that, "we are going to try to get back into ceramics and perhaps lead a Bible study class at the nursing home." (Tr.374). . . .
> . . . The ALJ skipped the part [in the entry of February 22, 2003] where Mr. Edwards said Ms. Harlow suffered a nightmare and did not sleep well after that, or where she was still trying to be more flexible regarding the things she could do now versus what she could do prior to

9

that "[t]here is no evidence she was prescribed psychiatric medications." (Tr. 22.) Harlow contends in her reply brief that "[s]he had been prescribed Trileptal and Zonegram (sic) for mood stabilization and coping." (Filing 22, at 4.) The record

> her accidents, or how Ms. Harlow was sorry to have to watch everyone around her do what she used to do. (Tr.373). The ALJ left out the February 18, 2003, entry where Mr. Edwards wrote of Ms. Harlow that "…therapy and journaling appear to be helping in a significant way…", but that her "Bible study at the nursing home is on hold." (Tr.372). . . . [T]he ALJ neglected to mention that . . . [the entry of March 11, 2003] referred to the fact that "physical pain" remained a significant problem for Ms. Harlow, and that Mr. Edwards' treatment plan for Ms. Harlow was scaled back to just telephoning residents in the nursing home or mailing cards to offer spiritual help. (Tr.372). . . .
> 
>     . . . [T]he ALJ [also] chose to ignore the rest of the March 11 note about Ms. Harlow having "severe pain", still having "nightmares", or "about her body and brain being at war!" Plus, she had yet to start phoning and mailing cards to the nursing home residents. (Tr.370). The ALJ skipped the chart note of April 29, 2003, wherein it was noted that Ms. Harlow was having occasional panic attacks. (Tr.367). However, the ALJ jumped to May 27, 2003, to say that Ms. Harlow had reduced her anger and was no longer journaling. (Tr.365). He overlooked the part about re-injuring her neck just by braking her car quickly, and Ms. Harlow apparently had made progress in <u>adjusting to her disability</u>. (emphasis supplied) (Tr.365). On September 30, 2003, Mr. Edwards wrote in her chart that Ms. Harlow made significant improvement and could now look at him directly when she spoke! (Tr.350). . . .
>     Finally, the ALJ cited the last entry from Mr. Edwards in the record before him, June 7, 2004. The ALJ actually referred to the date as July 20, 2004, but that was not possible. (Tr.22). The chart entry noted that Ms. Harlow had not had any nightmares and no panic attacks. (Tr.318). However, three weeks earlier on May 17, 2004, Ms. Harlow reported that she had had a nightmare since April 26, 2004, but she continued to cope with her illness "as well as possible" with her doctor's medical care and prescriptions. (Tr.320).

(Filing 22, at 12-15.)

10

reflects that these medications were prescribed by Dr. Jeffrey Edwards at the Medical Pain Relief Clinic, but there is no evidence that they were prescribed to treat depression or anxiety. Trileptal and Zonegran are primarily anticonvulsant drugs.

In summary, the ALJ did not make a wrong determination at step three of the disability analysis that he performed pursuant to 20 C.F.R. § 404.1520. The ALJ properly rejected the PRTF completed by Mr. Edwards because it is not supported even by his own notes and is inconsistent with the record as a whole. The fact that the ALJ did not fully discuss every notation made by Mr. Edwards is inconsequential. See Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."). There simply is no credible evidence to support Harlow's claim that she suffers from depression of such severity that Listing 12.04 is met.

## B. Hypothetical Questions

Harlow next contends that the ALJ erred at step five of the analysis because he "never fully described all of [her] limitations in one hypothetical and largely, if not completely, ignored her mental impairments." (Filing 12, at 11.) Although I find nothing wrong with the form of the hypothetical questions related to Harlow's physical limitations, or with the ALJ's determination of Harlow's mental RFC, I conclude that the ALJ erred in dismissing a physical RFC assessment that was prepared on June 20, 2004, by Katherine Harrison, M.D., and by failing to request an opinion from Harlow's treating physician, Dr. Edwards.

Generally, if the claimant suffers from nonexertional impairments that limit her ability to perform the full range of work described in one of the specific categories set forth in the guidelines, the ALJ is required to utilize testimony of a vocational expert. Draper v. Barnhart, 425 F.3d 1127, 1132 (8th Cir. 2005). For a VE's opinion

11

to be relevant, an ALJ must accurately characterize a claimant's medical conditions in hypothetical questions posed to the expert. Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004). The hypothetical must include all impairments that are supported by substantial evidence in the record as a whole. Tucker v. Barnhart, 363 F.3d 781, 784 (8th Cir. 2004). "[T]he hypothetical is sufficient if it sets forth the impairments which are accepted as true by the ALJ." Harvey, 368 F.3d at 1017 (quoting Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985)).

The ALJ in this case determined that Harlow has the residual functional capacity to perform sedentary work with a moderate limitation in overhead and side reaching with the right dominant upper extremity and slight limitations in attention, concentration, understanding, and memory. (Tr. 25.) The ALJ posed a series of hypothetical questions to the VE that included these restrictions, among other alternatives.

One hypothetical asked the VE to assume "a sedentary RFC . . . [for] an individual, 46 years of age, high-school education, vocational training as testified to, work history as described, and the following restrictions: [S]he can lift/push/pull 10 pounds occasionally, 5 frequently. Walk, stand, stoop bend occasionally. [S]it frequently." (Tr. 481.) The VE opined that such an individual could return to the past work as a teacher's aide and could perform these other jobs:

> There would be cashiers at semi-skilled and sedentary, and within the region [including Iowa, Nebraska, Missouri, and Kansas], there are approximately 18,000. There would be sedentary interviewers at a semi-skilled level, and in the region, there would be approximately 3,900. Unskilled, there would be unskilled general office clerks, and at the sedentary level, there would be approximately 13,300. And then there would be unskilled records clerks, sedentary and in the region, there would be approximately 1,400.

(Tr. 481-82.) The ALJ subsequently asked the VE to assume that the individual "is going to be slightly limited in attention, concentration, understanding and memory,

12

[and] moderately limited in overhead and side reach with the right dominant feature." (Tr. 482.) The VE testified that such an individual could not perform her past relevant work as a teacher's aide and there would be approximately a 70 percent erosion in the number of other jobs that she could perform. (Tr. 482.) The ALJ relied upon this testimony to conclude that there still are a significant number of jobs in the national economy that Harlow can perform. (Tr. 24-25.)

A series of hypothetical questions, rather than a single question, is proper so long as all credible limitations were presented to the vocational expert in a comprehensible manner. See Bland v. Bowen, 861 F.2d 533, 534 (8th Cir. 1988) (VE was asked a series of hypothetical questions that embodied claimant's various exertional and nonexertional limitations); Ward v. Heckler, 786 F.2d 844, 848 (8th Cir. 1986) (ALJ posed a series of hypothetical questions that included the claimant's physical impairments but varied the severity of the limitations imposed). Harlow's challenge to the format of the hypothetical questioning thus is without merit.

Although Harlow does not directly challenge the ALJ's determination of her physical and mental RFC at step four,[10] her argument concerning the hypothetical questions that were posed to the VE touches upon this issue. That is, Harlow argues that the only valid hypothetical was one constructed by her counsel, using the physical RFC assessment that Dr. Harrison prepared (Exhibit 14F). The VE testified that with those restrictions, which included being able to sit in a reclining position for six hours during each workday, "there would not be any jobs the individual could perform." (Tr. 483.) Harlow also points out that her counsel's hypothetical did not even include any mental limitations, but, as discussed above, the record does not establish that Harlow has a medically determinable mental impairment of any kind, notwithstanding the ALJ's finding that she has an anxiety disorder.

---

[10] "The RFC is used at both step four and five of the evaluation process, but it is determined at step four, where the burden of proof rests with the claimant." Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005).

13

My concern lies with the ALJ's rejection of Dr. Harrison's RFC assessment. The circumstances under which this June 20, 2004 assessment was prepared are not known. The index to the administrative record states that Dr. Harrison is a "DDS physician" (Tr. 5), but the record reflects that Dr. Harrison actually treated Harlow for low back and neck pain on at least 3 occasions in early 2002. (Tr. 260-65.) Harlow states that Dr. Harrison referred her to Dr. Edwards. (Tr. 81.) Dr. Harrison appears to have regularly received copies of Dr. Edwards' treatment notes. (Ex. 5F, 16F.) The RFC assessment is accompanied by a functional capacity evaluation (FCE) that was conducted a few days earlier by a physical therapist. The ALJ summarized the contents of the FCE and the RFC assessment as follows:

> The claimant was referred for a functional capacity evaluation which was performed by Jennifer L. Fowler, PT, DPT, on June 16, 2004. The claimant reported that she spends 14 hours per day sitting in a recumbent recliner and 6 hours per day sleeping in a recumbent recliner. She stated she could drive/ride in a car for 1 hour before needing a rest. Range of motion testing of the cervical spine showed a total of 12% impairment, while range of motion testing of the lumbar spine showed a total of 18% impairment. The claimant was unable to lift more than 1 pound with her arm to pass the minimum threshold for measurement (Exhibit 14F/11). There were no neurological deficits. Ms. Fowler noted the claimant scored 3/5 on the Waddell's protocol and 5/21 on the Korbon's protocol, indicating a non-organic component to her pain and impairment. Ms. Fowler also noted the claimant passed only 25/40 validity criteria during the functional capacity evaluation, which suggests poor effort and borderline invalid functional capacity evaluation results (Id. at 13). Despite such results, Ms. Fowler essentially precluded even sedentary work. However, she commented that because the claimant passed only 63% of her validity measurements, including inconsistent material handling, her abilities are considered to be remarkably conservative (Id. at 14).
>
> Exhibit 14F/1-8, received at the hearing, contains a residual functional capacity assessment form dated June 22, 2004, which essentially precludes even sedentary work. The signature is not completely discernible, it appears to be from Dr. Kathleen Harrison. The

14

assessment form mentions that the limitations are conservative due to the claimant's low validity score from the functional capacity evaluation (Exhibit 14F/2). The form also states the severity or duration of the claimant's symptoms is disproportionate to the expected severity or duration as evidence[d] by the 2 tests that were positive for non-organic symptoms (Id. at 6).

(Tr. 19-20.) The ALJ rejected the FCE and the RFC assessment, stating in a repetitive manner that:

I do not accept the assessments from the physical therapist (Exhibit 14F/14) and Dr. Harrison (Exhibit 14F/1-8) essentially precluding even sedentary work because they are not consistent with the functional capacity evaluation by the physical therapist showing only a 12% impairment in cervical range of motion, and 8% impairment in lumbar range of motion and no neurological deficits. Equally important is that the claimant scored 3/5 on the Waddell's protocol and 5/21 on the Korbon's protocol, indicating a non-organic component of her pain and impairment, and she passed only 25/40 validity criteria during the functional capacity evaluation, which suggests poor effort and borderline invalid function capacity evaluation results (Exhibit 14F/13). In fact, Dr. Harrison mentioned that the limitations are conservative due to the claimant's low validity score from the functional capacity evaluation (Exhibit 14F/2), and that the severity or duration of the claimant's symptoms is disproportionate to the expected severity or duration as evidence[d] by the 2 tests that were positive for non-organic symptoms (Exhibit 14F/6).

(Tr. 21.)

The ALJ instead determined to rely upon a physical RFC assessment that was prepared by a reviewing physician on February 21, 2003 (Ex. 4F), and affirmed by another reviewing physician on May 15, 2003 (Ex. 8F). These reviewing physicians cited the results of a physical examination that was performed on February 22, 2003, by Samuel E. Moessner, M.D. (Ex. 3F), and treatment notes of Dr. Edwards that were available at that time (Ex. 5F). Dr. Moessner, while not expressing an opinion as to

15

the extent of Harlow's physical limitations, noted "[s]ome probable traumatic arthritis of the right shoulder, right sacroiliac possibly, and possibly right lumbosacral regions from alleged traumatic injuries," "[p]ossible early osteoporosis and/or osteoarthritis from history and physical," and "[h]istory of headache disorder most likely due to cervical muscle spasm, as noted on physical examination." (Tr. 167.)

While there may be good reasons for discounting Dr. Harrison's assessment, "relying upon non-examining, non-treating physicians to form an opinion on a claimant's RFC does not satisfy the ALJ's duty to fully and fairly develop the record." Dixon v. Barnhart, 324 F.3d 997, 1002 (8th Cir. 2003) (summarizing holding in Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)). The ALJ knew that Harlow was seen by Dr. Edwards about every 2 weeks between May 13, 2002, and June 21, 2004 (Ex. 4F, 8F). In fact, as evidenced by additional medical records submitted to the Appeals Council, he continued to see her on a biweekly basis until at least January 17, 2005. (Ex. AC-2, Tr. 396-429.) Harlow testified that she was told by Dr. Edwards not to lift more than 5 pounds, not to drive, and to rest while taking different medications 8 to 10 times a day. (Tr. 454-56.) These directives do not appear in Dr. Edwards' treatment notes, but neither are they mentioned in the ALJ's decision. The ALJ's summarization of Dr. Edwards' treatment notes is also very selective.

I conclude that "the ALJ was obligated to contact [Dr. Edwards] . . . for 'additional evidence or clarification,' 20 C.F.R. § 404.1512(e), and for an assessment of how the 'impairments limited [Harlow's] ability to engage in work-related activities.'" Bowman v. Barnhart, 310 F.3d 1080, 1085 (8th Cir. 2002) (citations omitted). "Instead of developing the record from [Dr. Edwards], in assessing [Harlow's] residual functional capacity, the ALJ improperly relied on the report of a state consultant, who did not examine [Harlow]." Id. See also Nevland, 204 F.3d at 858 ("In spite of the numerous treatment notes . . . not one of [claimant's] doctors was asked to comment on his ability to function in the workplace.").

16

## C.  Credibility Determination

Finally, Harlow argues that the ALJ erred in finding that her complaints of disabling pain are not credible.  To assess a claimant's credibility, the ALJ must consider all of the evidence, including prior work records and observations by third parties and doctors regarding daily activities, the duration, frequency, and intensity of pain, precipitating and aggravating factors, the dosage, effectiveness, and side effects of medication, and functional restrictions.  Lowe v. Apfel, 226 F.3d 969, 971-72 (8th Cir. 2000) (citing Polaski).  The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole.  Id. at 972.

The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.  Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001).  Even if every Polaski factor is not discussed in depth, deference must be given to the ALJ's judgment where good reasons have been given for discrediting the claimant's testimony.  See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001).

In this case, the ALJ gave the following reasons for discrediting Harlow's testimony:

> The claimant's subjective complaints and alleged limitations are out of proportion to the objective findings as noted above.  The disabling neck and low back pain alleged by the claimant are not supported by the lumbar spine and cervical spine MRIs.  The claimant told Dr. Moessner [a consulting physician who examined Harlow on February 23, 2003] that she can lift about 10-15 pounds without difficulty, which is consistent with a sedentary residual functional capacity. . . .
>
> The claimant's subjective complaints and alleged limitations are not consistent with the treatment she receives.  The claimant has routine office visits for her physical complaints.  There are no inpatient

> hospitalizations or emergency room care for her alleged neck, back and leg pain. The claimant is treated conservatively with medication management. There is no evidence of aggressive physical therapy. She has not requested, and her treating doctor has not referred her to the appropriate specialists for extensive work-up of her physical complaints. She does not use medication for her subjective mental complaints. . . .
>
> The claimant's activities of daily living are out of proportion to her allegation of total disability. The claimant told Dr. Moessner that she generally walks the dog daily for about one or two blocks, she does some cooking, light housekeeping and other chores, she drives moderate distances, she does light yard work at times, she was currently a housekeeper and does some of the yard work and housework, including grocery shopping, and her and her "disabled" husband take care of another disabled gentleman (Exhibit 3F/3-4). She told Dr. Warren that she makes breakfast for her "disabled" husband and another disabled individual, she dusts, vacuums and cleans house and she grocery shops (Exhibit 6F/2). . . .
>
> The credibility of the claimant's subjective allegations is seriously questionable in light of the findings from the functional capacity evaluation [performed by a physical therapist on June 16, 2004] indicating poor effort and borderline invalid functional capacity results (Exhibit 14F/13).

(Tr. 23-24.)

Impairments that are controllable or amenable to treatment do not support a finding of total disability. Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003); Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999). When evaluating a claimant's alleged disability, it is also proper to consider a claimant's uncooperative or exaggerated responses during a medical examination. Brown v. Chater, 87 F.3d 963, 965 (8th Cir.1996). A claimant need not be bedridden to qualify for disability benefits, see Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir.1999), but daily activities that are inconsistent with complaints of disabling pain provide a basis for discounting

subjective complaints. Haynes v. Shalala, 26 F.3d 812, 815 (8th Cir. 1994); Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir.1993).

Harlow's testimony regarding her activities in June 2004 differed significantly from the description that she provided to Dr. Moessner in February 2003.[11] Harlow essentially testified that she spends almost all day in a recliner, watching television for 18 hours and sleeping for 6 hours. She testified that she prepares only one meal per day; that she does not wash dishes; that she does not mop, sweep or vacuum the floors; that she dusts once every two weeks; that she puts clothes into the washer once a week but has someone else take the clothes out and put them into the dryer; that she goes grocery shopping once a month; that she leaves the house perhaps once a week; that she does not drive because her medications make her sleepy; that she cannot stand for 10 minutes; that she cannot sit upright for more than 5 or 10 minutes; and that she cannot walk a block. The ALJ obviously did not believe this testimony, but his decision does not even mention it. The decision does reference a "daily activities and symptoms report" that Harlow completed on September 19, 2002 (Exhibit 4E),

---

[11] Even the level of daily activities that Harlow described to Dr. Moessner might not provide a reason for discrediting her subjective complaints of pain. See Swope v. Barnhart, 436 F.3d 1023, 1026 (8th Cir. 2006) ("In numerous cases we have noted that 'the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work.'") (quoting Hogg v. Shalala, 45 F.3d 276, 278 (8th Cir.1995); Draper, 425 F.3d at 1131 (fact that claimant tried to maintain her home and did her best to engage in ordinary life activities was not inconsistent with her complaints of pain); Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005) ("It is necessary from time to time to 'remind the Secretary that to find a claimant has the residual functional capacity to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'") (quoting Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir.1989)); Banks v. Massanari, 258 F.3d 820, 832 (8th Cir.2001) ("How many times must we give instructions that [watching television, visiting friends, and going to church] do not indicate that a claimant is able to work full time in our competitive economy?").

which is generally consistent with her trial testimony, but the ALJ summarily rejected that report "for the reasons stated above." (Tr. 24.)

The ALJ's decision does not reflect that appropriate consideration was given to Harlow's subjective complaints. For example, the fact that Harlow "has routine office visits for her physical complaints" is hardly inconsistent with her testimony that she has chronic pain. The ALJ also noted that Harlow was treated with "medication management," but he did not discuss the actual prescriptions involved or Harlow's claim that the medications make her sleepy and require her to rest throughout the day. The ALJ's decision does not even cite Polaski or acknowledge the relevant factors to be considered.

### III. CONCLUSION

I find that the Commissioner's decision to deny benefits is not supported by substantial evidence on the record as a whole. The ALJ failed to fully and fairly develop the record by requesting additional information and an opinion from Dr. Edwards regarding Harlow's physical restrictions, and also failed to make a proper credibility assessment before determining Harlow's residual functional capacity.

Accordingly,

IT IS ORDERED that judgment shall be entered by separate document generally providing that the final decision of the Commissioner is reversed and the cause remanded for further proceedings consistent with this opinion.

June 7, 2006.                               BY THE COURT:

                                            s/ *Richard G. Kopf*
                                            United States District Judge